## Case No. 2,011.

### BROWN v. HIATT.

[1 Dill. 372;[1] 4 Am. Law T. Rep. U. S. Cts. 73; 3 Chi. Leg. News, 185.]

Circuit Court, D. Kansas.  1870.[2]

PAYMENT—COLLATERAL SECURITIES—REBELLION— STATUTE OF LIMITATION—CONFISCATION ACTS.

1. A debtor who sets up as a defence that his creditor agreed to accept collaterals held by him in satisfaction of his debt, must establish it; and where such an agreement is alleged to be contemporaneous with the creation of the debt and is not mentioned in the written assignment of the collaterals, and where the collaterals are less in amount than the debt, it was considered by the court as intrinsically improbable.

2. During the whole period occupied by the late Civil War, the complainant, a creditor, resided in an insurrectionary state, and the respondent, his debtor, in a state which adhered to the Union: Held, that the statute of limitations of the state in which the debtor resided was suspended by the war, and hence, in computing the time which has run, the period during which the war continued is not to be counted.

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

[2] [Reversed by supreme court of United States in 15 Wall. (82 U. S.) 177.]

3. The time is suspended during the war, although the statute of limitations had begun to run before the war began.

4. The case of a creditor living in an insurrectionary state is not distinguishable from one where, as in Hanger v. Abbott, 6 Wall. [73 U. S.] 532, the creditor resided in a loyal state. Arguendo, per Dillon, Circuit Judge.

5. The act of congress of June 11, 1864 (13 Stat. 123), is not in conflict with the point above stated, respecting the effect of the war on the statute of limitations.

6. The act of congress of July 13, 1861 (12 Stat. 255), construed and regarded as contemplating (upon the issue of the proclamation therein authorized), a condition of entire nonintercourse of a pacific character between the inhabitants of the opposing sections, except such as should be authorized by the president; one effect of which legislation was to suspend the remedy and the right to sue upon all contracts, irrespective of the fact whether the creditor residing in the insurrectionary state was, or was not, in sentiment and acts opposed to the rebellion. Arguendo, per Dillon, Circuit Judge.

7. The late conflict was a civil war, and was attended with the usual and general incidents of such a war. Arguendo, per Dillon, Circuit Judge.

8. State statutes of limitation, where congress has not otherwise specially provided, form rules of decision in the national courts, which will give to them the same effect that they have, or are entitled to, in the courts of the state enacting them. Arguendo, per Dillon, Circuit Judge.

9. The holder of a collateral security is not liable for a loss occurring without his fault; nor is he liable for neglecting to sue or look after the security when the person from whom it was received was, by the understanding of the parties, to do this.

10. Where a collateral security was confiscated under the statute of July 17, 1862 (12 Stat. 589), because of acts charged against the creditor holding such collateral, and the confiscation proceedings are valid on their face, and have never been set aside or directly assailed: *Held*, that in stating an account between the parties, who were mortgagor and mortgagee, the latter should be charged with the full value of the note so confiscated as his property.

[See note at end of case.]

11. A decree condemning property under the confiscation act, where the record of the proceeding shows that a libel of information was duly filed, and a writ of monition issued and a return of service that the res has been attached, is not void on its face, and cannot be collaterally assailed in a bill to foreclose, by evidence that the res was always in the possession of the complainant, and hence the marshal's return was not true, and therefore, as there was no seizure, the confiscation proceeding was without jurisdiction, and void.

12. Interest, for special equitable reasons, disallowed during the war to a creditor residing in an insurrectionary state.

[See Bigler v. Waller, Case No. 1,404; Chappelle v. Olney, Id. 2,613; Shortridge v. Macon, Id. 12,812.]

[13. Cited in U. S. v. Fifteen Hundred Bales of Cotton, Case No. 15,958, to the point that the Rebellion in Arkansas did not end until the proclamation of the president so declaring.]

In equity. This is a bill by [Edward S. Brown] a mortgagee against the mortgagors [Benajah W. Hiatt and Martha Ann Hiatt]

to foreclose the mortgage below described. [Decree for complainant.]

The original bill was filed February 27, 1867. On the 29th day of May, 1860, the complainant, who is now and always has been a citizen of Virginia, while on a business visit to Kansas, loaned the respondents, citizens of Kansas, the sum of $2,000, and took therefor their bond, dated May 29, 1860, for $2,400, payable May 29, 1861. This bond was secured by a mortgage of even date, executed by the respondents to the complainant upon three hundred and twenty acres of land in Leavenworth county, in the state of Kansas, and is the mortgage of which a foreclosure is now sought. Both parties agree that the respondents gave to the complainant at the same time, as further or collateral security, a note made by one Kenyon for $800, less a payment of $75, secured by mortgage. This mortgage was, on the 29th day of May, 1860, on the margin of the record thereof, assigned by Hiatt to Brown "as collateral security for the payment of a bond dated May 29, 1860, payable twelve months after date for $2,400, signed by myself and wife to Edward S. Brown."

Respondent at the same time gave complainant, as further or collateral security, a decree or judgment in favor of respondent against one Perkins, secured by mortgage on a house and lot in the city of Leavenworth for $763.13, and the judgment or decree was assigned on the 29th day of May, 1860, by Hiatt to Brown. This assignment is in terms absolute, but both parties agree that it was made as collateral security to the bond and mortgage now in suit. Out of these collaterals some of the defences relied upon arise, and they will be referred to hereafter. The defences to the present bill of foreclosure are, in substance, these: 1. A special verbal agreement, made at the time of the loan, whereby the respondents had the right to elect to turn over the Kenyon note and the Perkins judgment to the complainant, in satisfaction of the bond and mortgage now in suit; and it is alleged in the answer, that the respondents did elect thus to satisfy the said bond and mortgage, and that the complainant, by letter, assented thereto. The existence of any such agreement, letter, or assent is wholly denied by the complainant. 2. The statute of limitations of the state of Kansas, which requires an action of this nature to be brought within three years from the time when the right to sue accrued. The complainant, a resident of the insurrectionary portion of the state of Virginia, relies, to avoid the operation of the statute, upon the proposition that he is, in law, entitled to have deducted from the computation the space of time covered by the war. It is conceded that if this deduction be made, the complainant is not barred, but otherwise he is. 3. The third defence arises out of the two collaterals named above, to-wit: the Kenyon note and the

Perkins judgment. Respondents claim that these have been wholly lost to them by the fault or neglect of the complainant; and that in making up the account, the complainant is equitably chargeable with the amount thereof.

The further facts in this respect, are stated in the court's opinion. It is only necessary, in this place, to add that the Kenyon note was confiscated by proceedings in the United States district court for Kansas, in 1863, on behalf of the United States, under the act of July 17, 1862 [12 Stat. 589], on the ground that it was the property or a credit of the complainant, and that he was, as alleged, a rebel, or engaged in aiding the rebellion. The complainant contends that this proceeding was procured to be instituted by the fraud of the respondent Hiatt, and that the latter should suffer the loss of the debt against Kenyon, if it be lost. The property securing the Perkins judgment was, during the war, sold on execution, under the direction of the respondent, and bid off in the name of the complainant. It was subsequently decided, by the proper court, that another mortgage, in favor of one Cockrell, had priority over the one which Hiatt had assigned to the complainant, and the sale under this prior mortgage swept away the property. and Perkins had no other property, out of which the judgment of Hiatt could be made. The case was submitted to the court upon the amended bill, answer, replication, and the exhibits, documentary, and other testimony.

H. T. Green and Wilson Shannon, for complainant.

Hiram Griswold, for respondents.

Before DILLON, Circuit Judge, and DELAHAY, District Judge.

DILLON, Circuit Judge. The execution of the bond and mortgage in the suit being admitted, the complainant is entitled to a decree of foreclosure, as prayed, unless some of the defences relied upon by the respondents have been established. To these we now turn our attention, and they will be separately considered.

1. As to the alleged agreement to take the collaterals in satisfaction. It is claimed by the respondent, Hiatt, that at the time the loan was made of the complainant, and the bond and mortgage, in suit, were executed. and the Kenyon note was delivered, and the Perkins judgment was assigned to the complainant, that it was verbally agreed (as stated by Hiatt in his testimony on this point) "that, whenever he requested it, the plaintiff was to take the Kenyon note and mortgage and the judgment against Perkins, and release the mortgage from myself to him." The respondent testifies that in 1862 he wrote to the complainant in Virginia, claiming the benefit of this agreement, and that the complainant, recognizing the agree-

ment, wrote in reply, that he would accede to his request. The existence of such an agreement, the complainant positively denies. He also denies receiving from the respondent a letter making such a request, or writing to him a letter agreeing to accept the collaterals in satisfaction of his debt.

The alleged agreement is not satisfactorily proved. On the contrary, it is perfectly clear to our minds, that no such agreement was made. Such an agreement is not consistent with the language of the written assignment of the Kenyon mortgage, which, in terms, states that it was assigned "as collateral security." Again, assuming the Kenyon note and the Perkins judgment to be perfectly good, and worth their face, they do not equal in amount, by several hundred dollars, the sum of money which the complainant actually loaned to the respondent, a circumstance strongly tending to show the intrinsic improbability that any such agreement, as the respondent now alleges, was in fact made.

Again, the letter which he says he received from the complainant, agreeing to take the collaterals in satisfaction of his debt, is not produced, and the writing of any such letter is positively, and on oath, denied by him. The respondent says this letter was mailed in Virginia, and fixes its date and receipt at a time when communication, by mail, between that portion of Virginia and the rest of the United States had entirely ceased.

Again, the respondent's conversations with others, as, for example, Judge Crozier, long after this alleged satisfaction of his debt, in which he distinctly admitted that he was indebted to the complainant in the amount of the bond for $2,400, now in suit, is irreconcilable with the theory the respondent now propounds, and which we are at present discussing. Without longer dwelling upon this point, we conclude by expressing it, as the opinion of the court, that this defence is not established.

2. The Statute of Limitations. By the statute of limitations of the state of Kansas, it is provided that "an action upon a specialty, or any agreement, contract, or promise in writing," shall be brought "within three years" from the time the cause of action accrued. Laws Kan. 1859, c. 3, p. 84, §§ 19, 20. Under the thirty-fourth section of the judiciary act, this statute of limitations is applicable to the present suit. State statutes of limitation, in the absence of provision otherwise by congress, form the rule of decision in the national courts, which will give to such statutes the same effect that they have, or are entitled to, in the courts of the states. McCluny v. Silliman. 3 Pet. [28 U. S.] 270; U. S. Bank v. Daniels, 12 Pet. [37 U. S.] 32; Porterfield v. Clark, 2 How. [43 U. S.] 125; Hanger v. Abbott, 6 Wall. [73 U. S.] 532, 537.

During the whole period covered by the late Rebellion, as well as before and since,

the complainant resided in, and was a citizen of, the state of Virginia, and of that portion of the state which was declared, by the proclamation of the president, to be in insurrection against the government of the United States. The bond in suit became payable May 29, 1861. This suit was brought February 27, 1867. The complainant claims that in computing the time which has run since his debt matured, he is entitled to have deducted therefrom the period occupied by the war, when all communication between the parties was not only impracticable, but unlawful. If the complainant is entitled to this deduction, it is obvious that the present suit was commenced in time. Equally obvious is it that if the time covered by the war is not to be excluded from the computation, the suit is barred by the statute. The complainant, in his testimony, which is the only evidence on the subject, says that he was, during the late conflict, simply a private citizen, and was at home, and held, it is to be inferred from his statement, no office, agency, or place in the Confederate States or service. There is no evidence, one way or the other, as to the sentiments of the complainant with respect to the war, or whether he did or did not aid or abet the Rebellion. The question is, therefore, to be considered simply as one between an inhabitant of an insurrectionary state, and an inhabitant of a state which "maintained a loyal adhesion to the Union and the constitution."

So far as the court is advised, it is one which, in the form now presented, has never been determined in the supreme court. This circumstance, as well as the gravity and difficulty of the question, will justify, if it does not require, the somewhat extended discussion necessary to present the grounds of the conclusion at which we have arrived.

The leading, and up to this time, the only, decision of the supreme court as to the effect of the late conflict upon state statutes of limitations, is that of Hanger v. Abbott, 6 Wall. [73 U. S.] 532. This judgment holds when a creditor, being a citizen of a loyal state, brings an action on a contract against his debtor, a citizen of and residing in a state which went into the Rebellion, that the period during which the creditor was prevented by the conflict from asserting his rights, is not to be included in the computation of time fixed by statutes of limitation. The case just cited is, as to parties, the reverse of the present one, for here we have a creditor who is a citizen of a state which was in insurrection, bringing his action against his debtor, a citizen of a loyal state, and claiming the benefit of the same rule of law, to which, in the case referred to, it was adjudged that the loyal creditor was entitled. To the case just mentioned (Hanger v. Abbott), we shall again have occasion to refer, and to discuss the point whether, in principle, it can be discriminated from the

case at bar. On assumption that the question in this case may be different from that determined in the case mentioned, we proceed to an independent examination of the question as to the effect of the war of the Rebellion upon the complainant's rights under his contract with the respondents.

Properly to understand the effect of the war upon contract rights, it is necessary to inquire into the nature of the conflict. In view of the doctrines laid down by authoritative writers on public law; of the nature, extent, and duration of the struggle, and of the character of the legislative acts of congress, and the action of the executive respecting it, there can be no doubt that it was a civil war, attended in law with all the general consequences of such a war, except where congress has otherwise provided, and where such consequences are inapplicable to the peculiar nature of the struggle, and of our government. "A civil war," Vattel says, "is when a party arises in a state which no longer obeys the sovereign, and is sufficiently strong to make head against him, or when, in a republic, the nation is divided into two opposite factions, and both sides take up arms.

"Civil war breaks the bonds of society and of the government; it gives rise in a nation to two independent parties, who acknowledge no common judge. They are in the position of two nations who engage in disputes, and not being able to reconcile them have recourse to arms. The common laws of war are in civil wars to be observed on both sides. The same reasons which make them obligatory between foreign states render them more necessary in the unhappy circumstances where two exasperated parties are destroying their common country." Vattel, 3, 54, c. 18, secs. 290–295. This language is quoted by Grier, J., in delivering his opinion in the Prize Cases, 2 Black [67 U. S.] 635. Riquelme says: "When a faction is formed in a state which takes up arms against the sovereign in order to wrest from him the supreme power, or impose conditions on him, or when a republic is divided into two parties which mutually treat each other as enemies, this war is called 'civil war.' Civil wars frequently commence by popular tumults, which in no wise concern foreign nations; but when one faction or party obtains dominion over an extensive territory, gives laws to it, establishes a government in it, administers justice, and, in a word, exercises acts of sovereignty, it is a person, in the law of nations; and however so much one of the two parties gives to the other the title of rebel or tyrant, the foreign powers which desire to maintain their neutrality ought to consider both as two states, independent as respects one another and other states, who recognize no judge of their differences." Bello Principios de Derecho International, c. 10. 267. Bluntschli, in his Code of International Law, a recent and

learned work, says: "War is an armed contest between different states upon a question of public right." "They recognize the quality of belligerents in armed forces, who, not having been recognized by any state already existing as having the right to contend in arms, have secured to themselves a military organization, and combat in good faith—in the place of and as a state—for a principle of public right." Bluntschli, 270, 271. "There is an exception," he continues, "to the rule that wars can take place only between states. When a political party seeks the realization of certain public objects, and organizes itself as a state, it becomes in a certain measure the state itself. The laws of humanity demand that the quality of belligerents should be accorded to that party, and that its people should not be considered a mass of criminals."

The late Rebellion, tested by these principles, was undoubtedly what is regarded as a civil war—something more than a mere commotion or civil disturbance. The various proclamations of the president, and the various acts of congress in reference to the war, clearly show that it was treated both by the legislative and executive departments of the government as a civil war, and those in rebellion were accorded all the usual rights of belligerents. Indeed, each house of congress, by the resolutions of July 22 [12 Stat. 268, ch. 9], and July 25, 1861 [12 Stat. 274, ch. 17], in terms, referred to the conflict as a civil war.

And the contest also has constantly been regarded and treated as a civil war by the supreme court of the United States. This subject first came before the court in the Prize Cases. 2 Black [67 U. S.] 635 (A. D. 1862), and it was held that there existed, in the sense of international law, a state of civil war between the states in rebellion and the United States, and that it was attended with all the usual incidents of a war between independent nations, such as the right of the government to blockade the ports of the insurrectionary states, to treat their inhabitants as enemies, and to capture their property. In those cases, and in many others since decided, the supreme court has uniformly held that the general rules and principles of international law are applicable to this conflict, and to the legal questions arising out of it, unless modified by congress. The Venus, 2 Wall. [72 U. S.] 258; Mrs. Alexander's Cotton, Id. 494; The Hampton, 5 Wall. [69 U. S.] 372; The William Bagley, Id. 377; The Ouachita Cotton, 6 Wall. [73 U. S.] 521; Hanger v. Abbott, Id. 532; Coppell v. Hall, 7 Wall. [74 U. S.] 542; McKee v. U. S., 8 Wall. [75 U. S.] 163; The Grapeshot, 9 Wall. [76 U. S.] 129.

In the case of The Grapeshot, supra, Chase, C. J., remarks that it has often been declared by the supreme court that the Rebellion was accompanied by all the general incidents of a regular war.

Having thus seen that the late conflict is to be considered as a civil war, and the legal questions arising out of it are to be decided, in the absence of controlling congressional action, by the principles of public law, we next inquire into the effect of this war upon the pre-existing contracts between parties respectively resident in the two hostile sections.

The well-settled doctrine of international law is that contracts made before the war are only suspended by it, and the right and the remedy revive on the termination of it, while contracts made between citizens of the opposing belligerents, during the war, are utterly void.

This doctrine has been repeatedly recognized by the supreme court as applicable to contracts and transactions between the inhabitants of insurrectionary and loyal states in the recent war. McKee v. U. S., 8 Wall. [75 U. S.] 163, 166; U. S. v. Lane, Id. 185; Coppell v. Hall, 7 Wall. [74 U. S.] 542; and Hanger v. Abbott, supra. See Phillips v. Hatch, post [Case No. 11,094].

In arriving at this conclusion, namely, that unlicensed intercourse during the war was unlawful, and that pre-existing contracts are only suspended by it, the supreme court has frequently had occasion to refer to the legislation of congress, and particularly to the important act of July 13, 1861 [12 Stat. 255, c. 3], the essential prohibitions of which continued in force during the whole period of the Rebellion.

It is important to notice with care the provisions of the fifth section of this statute. 12 Stat. 255, 257. It authorizes the president to proclaim and declare "the inhabitants" of certain states "or any section or part thereof, to be in a state of insurrection against the United States, and thereupon all commercial intercourse, by and between the same and the citizens thereof and the citizens of the rest of the United States, shall cease and be unlawful so long as such condition of hostility shall continue; and all goods, etc., coming from said state or section into the other parts of the United States, and all proceeding to such state or section, by land or water, shall, together with the vessel or vehicle conveying the same, or conveying persons to or from such state or section, be forfeited to the United States." Then follows a proviso authorizing the president, in his discretion, and for the public interest, to permit intercourse under regulations to be prescribed by the secretary of the treasury.

This statute is a valid exercise of legislative power; for the congress of the United States was not, by the Rebellion, deprived of the authority to legislate in this manner with a view to its suppression.

Its prohibition of intercourse is as broad as the prohibition, by the laws of nations, in the case of a war between independent states. By recurring to the act, it will be

seen to extend to "all" unlicensed "commercial intercourse."

It admits of no exceptions as to persons; for it prohibits intercourse, not simply between citizens of the insurrectionary states who were, in fact, disloyal, and citizens of loyal states, but it makes unlawful all unlicensed intercourse between all citizens of the hostile states or sections. All goods are prohibited to come from the insurrectionary sections into the other parts of the United States, and all goods are prohibited, likewise, from being sent from loyal to disloyal states. Vessels and vehicles are prohibited from conveying persons to or from the respective states or sections.

It is obvious that this act contemplates a condition of entire non-intercourse, of a pacific character, between the two opposing sections, except such as should be authorized by the president "for the public interest." What is the necessary effect of this condition? It is the same as when war exists between independent nations.

All existing contracts between citizens of the different sections are suspended. This from necessity, because the act forbids all intercourse, and intercourse is essential in order to fulfil, or perform, or enforce contracts. The courts of the one section are shut, by act of congress, to the people of the other, for the citizens of the insurrectionary states are forbidden to come into the other states, or hold any intercourse with their people; and, without this, suits cannot be instituted or carried on, and the same is true as to citizens of the loyal states.

It is manifest from the foregoing, that the complainant, was he never so loyally disposed toward the Union, had, by reason of his domicil in a state declared to be in insurrection, no right to institute or maintain, during the war, a suit in the courts of the United States, or of Kansas, for the recovery of his debt against the respondent. In a proceeding of this nature, the courts cannot, under the act of July 13, 1861, inquire whether the particular plaintiff was loyal to the Union, or aided the Rebellion; for, if he was a citizen of a rebellious state, he is regarded as an enemy, irrespective of his personal sentiments, sympathies, or acts. Mrs. Alexander's Cotton, 2 Wall. [69 U. S.] 404; The Venus, 8 Cranch [12 U. S.] 253; The Indian Chief, 3 C. Rob. Adm. 26; The Friendschaft, 4 Wheat. [17 U. S.] 105. We may observe that it has been accordingly held by courts and judges of great respectability, that citizens of rebellious states could not, during the recent war, maintain suits in the courts of other portions of the United States. Norris v. Doniphan [4 Metc. (Ky.) 385], A. D. 1863, Ct. App. Ky.; U. S. Dist. Ct. D. Mo., by Treat, J., in U. S. v. One Hundred Barrels of Cement [Case No. 15,945]; U. S. Cir. Ct. D. Conn., Semmes v. Insurance Co. [Id. 12,651]; Connecticut Mut. Life Ins. Co. v. Hall, 7 Am. Law. Reg. (N. S.) 606;

Jackson v. Insurance Co. [s. c. Semmes v. Insurance Co., supra].

Whether we apply to the question before us the legislation of congress, or the general rule of the public law, the conclusion is the same, viz.: That, during the war, the complainant was, as a necessary consequence of it, disabled to institute or maintain the present suit, and was so by reason of his citizenship, or domicil, alone, though ever so friendly to the government of the United States. It seems to follow, from these considerations, that the rule settled by the supreme court in Hanger v. Abbott [supra], is equally applicable, whether the creditor who brings suit was, during the war, a citizen of a state which engaged in the Rebellion, or of a state which adhered to the Union, and, in either case, the period covered by the war, during which the inability to sue continued, is not to be included in the computation of the time within which actions are, by the statute of limitations, required to be brought.

If the case just referred to be examined, it will be seen to rest on reasoning which makes it applicable to all creditors unable to sue, irrespective of their citizenship or domicil.

The principle of that case was adhered to and applied, in the subsequent case of The Protector, 9 Wall. [76 U. S.] 687, which holds that the period during which the war continued is not to be included in the computation of the five years' time allowed by the judiciary act for bringing writs of error; but, in this case, also, the creditor was a resident of a state which did not engage in the Rebellion.

The decisions of other courts tend to support the correctness of the views above expressed. To some of these we will now briefly refer. In Semmes v. Insurance Co. [supra], the United States circuit court for Connecticut held that the Rebellion had the effect to suspend the right of a citizen of Mississippi to sue on a policy issued by a Connecticut insurance company, and that the time when the right to sue was suspended, should be excluded from the computation of the limitation period.

So, in the fourth circuit, it has been decided in a case where a Tennessee corporation owed a bill of exchange, which matured before the war, against a Maryland debtor, that the conflict was a civil war, and imposed upon both parties the usual consequences of public wars, among which was the suspension of the right to sue, and, as a consequence of this, a suspension of the statute of limitations. Jackson Ins. Co. v. Stewart [Case No. 7,152]. Judge Redfield, in a note to the case last cited, adds his approval of the doctrine it holds, saying: "Since the late civil conflict practically interrupted all intercourse and all commerce between the different sections, we see no ground upon which, as respects the statute of limitations,

any distinction should be made between this and international wars, so long as there existed an actual non-intercourse, and a practical impossibility of enforcing the claim." It may be added, as we have before shown, that by the act of congress and the action of the president, the war not only practically but legally interrupted all intercourse, and that it not only created a practical, but a legal impossibility of enforcing, during its continuance, the collection of debts.

The principle that the effect of war is to suspend the running of the statute of limitations, has been held by other courts. Wall v. Robson, 2 Nott & McC. 498. See, also, Ogden v. Blacklege, 2 Cranch [6 U. S.] 272; Hopkirk v. Bell, 3 Cranch [7 U. S.] 454; 1 Am. Lead. Cas. 528, and cases cited; Bigler v. Waller [Case No. 1,404], opinion per Chase, C. J.

And this point must be noticed. The debt to the complainant, accrued May 29, 1861. The respondent claims that the war had not then commenced, and did not, in law, commence until the president's proclamation of the 16th of August, 1861, declaring Virginia in a state of insurrection, and therefore, the statute began to run against the debt before the war, and, if so, continues to run, notwithstanding the subsequent disability to sue. The views of a majority of the judges in the Prize Cases would perhaps authorize us to hold that the war existed before the August proclamation, and before the bond in suit matured. But we do not place our decision upon this ground, but upon the ground that even if the statute of limitations did begin to run, the effect of the act of July 13, 1861, and of the proclamation of August 16, 1861, was to suspend its operation. Where a statute continues to run, notwithstanding a subsequent disability, it is in cases where it is not unlawful to bring suit, and, perhaps, in cases only where it is possible to sue, as in the case of an infant or married woman, by next friend. The rule does not apply to the disability occasioned by a state of war. In Hanger v. Abbott, the plaintiff's debt accrued before the war, and yet the period covered by the war was deducted. So, also, in Jackson Ins. Co. v. Stewart, Semmes v. Insurance Co., and Wall v. Robson, before cited. And so, also, in The Protector, supra, the statute had begun to run before the war commenced, and yet, the period occupied by the war was not included in computing the time allowed to take an appeal. In this connection, it is proper to answer an argument strenuously insisted upon by the respondent's counsel, viz. that courts cannot add to the exceptions of the statutes. Ordinarily, it is undoubtedly true, that courts cannot put into the statutes of limitations exceptions which the legislature has not seen fit to adopt, or has omitted to put there. It is a sufficient answer to this objection, to say that the laws of war, especially those enacted by congress, are the

paramount law, and, by suspending the right of action, they suspend also the running of the statute. This seems to be the view of the court in Hanger v. Abbott, 6 Wall. [73 U. S.] 532, 541, 542.

Counsel have made no reference to the act of congress of June 11, 1864. 13 Stat. 123. We have, nevertheless, considered its bearing upon the question now under consideration. If it be admitted that it was intended by this act to refer to other limitation laws besides those which had been enacted by congress, and that it was competent for congress thus to do; and if it be further admitted that in its passage congress had in mind the case of citizens of loyal states who were creditors of citizens of disloyal states, still there is nothing in it which expressly or by any fair implication undertakes to furnish or declare a rule for any other than the cases mentioned, or for such a case as the one at bar. The result is that it is the opinion of the court that the statute of limitations is not available to the respondents as a bar to the complainant's bill. We proceed next to consider the other defences made by the respondents. The time devoted to the preceding discussions will induce us to dispose of the remaining questions, though important, with all practicable brevity.

Contemporaneously with the execution of the bond and mortgage in suit, the respondent, as collateral security, delivered to the complainant a note and mortgage made by Kenyon, and assigned to him a judgment against Perkins. The respondent claims that these have been lost to him by reason of the fault or neglect of the complainant. Different considerations apply to these two securities and they will be considered separately.

1. As to the Perkins judgment. This was assigned on the record to the complainant, but we find it to be the understanding of the parties, that whatever was necessary to be done to collect or prevent loss on the securities, was to be looked after by the respondent, who lived near his debtors, and not by the complainant, who lived in Virginia. Accordingly, the respondent caused a sale of the property which secured the Perkins judgment, to be made thereunder. His attorney did the business; he paid the costs, or agreed to, and he directed the sale to be made to the complainant. Afterwards the property was swept away from both the complainant and the respondent by a prior mortgage. For this the complainant is without blame and without liability. We perceive no ground whatever, in the proof, on which to hold the complainant chargeable with the amount of the Perkins judgment, or the amount for which the property was bid off in his name. It was all the doings of the respondent. The property was lost because the mortgage from Perkins to the respondent was defectively acknowledged.

This is the respondent's misfortune, certainly not the fault of the complainant.

2. As to the Kenyon note and mortgage. In 1862 the respondent went to the U. S. district attorney for Kansas, and informed him that he owed the complainant the amount of $2,400 on bond and mortgage; said it was liable to confiscation, and that he would rather pay the government than Brown. The attorney commenced proper proceedings to confiscate this bond, but they were dismissed because the respondent claimed and produced a letter purporting to be from Brown, showing that the bond was to be cancelled in consideration of the Perkins judgment and the Kenyon note. After this proceeding was dismissed, the attorney for the government commenced new proceedings, in 1863, to confiscate the Kenyon note, as the property of, or as a credit belonging to, the complainant. The record of that proceeding shows that an information was filed in the U. S. district court for Kansas, on the 10th day of September, A. D. 1863, on behalf of the United States, against the Kenyon note and mortgage, properly describing them, and the assignment to Brown. Kenyon was notified to show cause why he should not pay to the United States. A warrant and citation issued commanding the marshal "to attach the said note and mortgage and credits, and all the interests therein belonging to said Edward S. Brown." The marshal returned on the warrant that he had attached, as the property and credit of the said Brown, the Kenyon note, and had notified Hiatt, Kenyon, and all other persons having any right, title or interest therein, to appear as commanded, and that he had also published notice of the seizure, etc., in a newspaper, and posted the same on the court house door. At the November term, 1863, such proceedings were had that the court entered a decree condemning the note as forfeited to the United States, and ordering Kenyon to pay the same to the clerk of the court, and in default thereof, ordering a sale of the mortgaged property. Under this decree one half of the mortgaged estate was sold on a writ of execution, by the marshal, in July, 1864, for $542.76, to one Powell, and the money received from him by the marshal. In March, 1865, on an alias writ, the marshal sold the residue of the property to one George, for $668, and received from him the amount of his bid.

The proceedings on behalf of the United States against the Kenyon note and mortgage were taken under the act of congress of July 17, 1862 (12 Stat. 589). A libel of information was regularly exhibited, a warrant or writ of monition issued, and was returned by the marshal that he had attached the property as commanded. The proceedings are not void on their face, and the complainant under that act had an interest in this note and mortgage which, if he were guilty of the acts charged, would make it liable to condemnation. It may be that he was not guilty of any act which would authorize the decree of condemnation, and it may be that the decree is in some respects irregular or defective, but apparently it is not void; and there is no evidence that it has ever been reversed or set aside; and the present is not a suit to impeach it or have it set aside, or otherwise directly to attack it. It is by no means very fully or satisfactorily shown by the complainant that his relations to the Rebellion were such as that his property or interest in the Kenyon note was not liable to condemnation.

To avoid the effect of the decree of condemnation the complainant should have clearly shown his status during the war; that he had done no act which subjected his property to be seized and confiscated; and also that this unjust decree was brought about by the fraud of the respondent.

If these facts were shown, then in adjusting the rights of the two parties we would not allow the respondent to take any advantage of his own fraudulent acts. But these facts have not been satisfactorily established, and the complainant, in stating the account between the parties, will be charged with the full amount of the Kenyon note.

It may be said that the evidence in this suit shows that the Kenyon note was, during the whole war, in Brown's possession, and hence the marshal's return that he had attached it, cannot be true. See Pelham v. Rose, 9 Wall. [76 U. S.] 103. If untrue, it may be that he would be liable for a false return; at all events the decree pronounced cannot be collaterally assailed.

There is some conflict of opinion as to whether interest should be allowed during the war. That it should be, see opinion of Chase, C. J., in Shortridge v. Mason (Case No. 12,812); but the same distinguished judge, under similar circumstances, afterwards disallowed it in Bigler v. Waller, supra. That it should not be allowed because the debtor is prohibited from paying, see Tucker v. Watson, 6 Am. Law Reg. (N. S.) Feb., 1867, and cases cited; 1 Am. Lead Cas. 528, and authorities cited. Without now undertaking to discuss or decide which is the true rule, there are special circumstances in the case at bar not necessary to be enumerated, which induce the court to consider it most equitable to direct the disallowance of interest during the war.

In Ward v. Smith, 7 Wall. [74 U. S.] 452, it was held, that under the circumstances interest did not cease, but Mr. Chief Justice Chase says: "The opinion of the court was put upon circumstances creating an exception to the general rule. that interest does not accrue during war between citizens or subjects of belligerent states; the general rule was neither affirmed or denied." Bigler v. Waller, supra. In computing interest, the time between April 19, 1861, and May 26,

1865, will, as in the case last cited, be excluded.

Let a decree be drawn up in conformity with this opinion.

Decree accordingly.

NOTE [from original report]. In the circuit court of the United States for the eastern district of Arkansas, at the April term, 1871 (present Dillon & Caldwell, JJ.), it was held that the Rebellion did not end in the state of Arkansas, so as to revive the operation of the statute of limitations, until the proclamation of the president of April 2, 1866. As to statute of limitations, see, also, Levy v. Stewart, 11 Wall. [78 U. S.] 244, decided since the foregoing opinion was delivered. As to point ruled under the confiscation act, see Miller's Ex'rs v. U. S., Id. 268, and Tyler v. Defrees, Id. 331, decided by the supreme court, December term, 1870. Following these cases and the decision in Brown v. Hiatt [Case No. 2,011], the circuit court of the United States for the district of Kansas, at the May term, 1871 (present Miller and Dillon, JJ.), in Brown v. Kennedy [15 Wall. (82 U. S.) 591], held that other similar confiscation proceedings against Brown, where there was a return of seizure and notice to the debtor were not void, and would protect such debtors from subsequent repayment to Brown of the moneys paid into the district court under the confiscation decree.

[NOTE. Both parties appealed to the supreme court, where the decision was affirmed in part, but reversed on the ground that the complainant was not chargeable with any neglect in the collection of the collaterals; that the Kenyon note and mortgage having been confiscated, the mortgaged premises sold, and the proceeds paid into court, through a scheme of the defendant to defraud the complainant, and he (defendant) having led the district attorney to treat his own property as belonging to complainant, he must suffer the consequences, and that complainant was therefore entitled to judgment for the amount of the note, with interest at the stipulated rate, except for the period from April 27, 1861, the date of the president's proclamation of war, to April 2, 1866, the date of the proclamation of its close. Hiatt v. Brown, 15 Wall. (82 U. S.) 177.

[As to the effect of war on the running of the statute of limitations, also see Davie v. Hatcher, Case No. 3,610; U. S. v. Muhlenbrink, Id. 15,831; Chappelle v. Olney, Id. 2,613; Adger v. Alston, 15 Wall. (82 U. S.) 555; Gooding v. Varn, Case No. 5,539; Graydon v. Sweet, Id. 5,733; Stewart v. Kahn, 11 Wall. (78 U. S.) 493; U. S. v. Wiley, Id. 508; Ross v. Jones, 22 Wall. (89 U. S.) 586; Batesville Institute v. Kauffman, 18 Wall. (85 U. S.) 151; Delancey v. McKeen, Case No. 3,749; Lockhart v. Horn, Id. 8,445; Sierra v. U. S., 9 Ct. Cl. 224.]